Filed 2/28/22  P. v. Montgomery-Gutzman CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>TAYLOR WILLIAM MONTGOMERY-GUTZMAN,<br><br>    Defendant and Appellant. | C090701<br><br>(Super. Ct. No. 16FE022095) |

A jury found defendant Taylor William Montgomery-Gutzman guilty of assault and second degree murder of K., a 22-month old child, and of permitting K.'s twin B., to suffer unjustifiable physical pain and mental suffering.  Defendant was tried along with his former girlfriend and the twins' mother, Rebecca Thomas.  We have already affirmed Thomas's judgment.  (*People v. Thomas* (2021) 63 Cal.App.5th 612 (*Thomas*).)  Before us now is defendant's appeal, in which he contends the prosecutor committed several instances of prosecutorial error, while the trial court improperly admitted and excluded several items of evidence as well as erroneously instructed the jury.  Disagreeing with

1

every contention, we affirm the judgment of conviction. We, however, remand defendant's case for the trial court to determine whether to exercise its newly granted discretion when sentencing defendant.

## FACTUAL AND PROCEDURAL BACKGROUND

The facts of defendant's case were recounted in Thomas's appeal. (*Thomas, supra*, 63 Cal.App.5th at pp. 615-624.) We recite them with slight modifications relevant to the issues defendant raises on appeal.

## I

### *Facts Underlying The Crimes*

"[Thomas] hated children and never wanted to have them. Despite that fact, [Thomas] had several children and a history of involvement with child protective services. Her first interaction with child protective services occurred in 2004 when [her] oldest child was three weeks old and [she] told a friend not to comfort the infant when he cried because [she] did not want him to be spoiled. Soon thereafter, [Thomas] called the same friend and told her the baby was not having a good day, and he was crying uncontrollably. [Thomas] said she had 'already tried killing the kid; I strangled him until he stopped breathing.' [Thomas's] friend reported the incident to child protective services. The report was determined to be unfounded and [Thomas] was given information about a crisis nursery and family resource center. [Thomas's] oldest child went to live with [her] parents at six months old and continued to do so, except for a year when he was five years old. While the living arrangement was prompted by child protective services, there was no official order requiring [Thomas's] oldest child to live with [her] parents.[1]

---

[1]    While the trial court admitted this evidence under Evidence Code section 1109, it excluded child protective service records containing allegations and agency conclusions pertaining to Thomas's neglect of her oldest child, as well as her other children.

2

"[Thomas's] second child was born eight years after her first. At that point, [Thomas] had a methamphetamine and heroin addiction, as did the father of [Thomas's] second child.[2] The two were violent with each other, and their child never lived with them. Instead, the child lived with [Thomas's] parents. In the years that followed, their child sometimes stayed with [Thomas] overnight, but [Thomas's] parents raised the child.

"Sometime after [Thomas's] second child was born, [Thomas] stopped doing drugs, except for marijuana and prescription methadone. While taking methadone, she became pregnant with twin boys, K. and B. The twins were born eight weeks premature and tested positive for methadone and marijuana at birth but did not suffer from withdrawals. Unrelated to their positive drug tests, both K. and B. had breathing issues due to their premature lungs. Further, their intestines were premature, requiring them to be fed through a gastric tube. K. and B. remained in the hospital for four months because they had trouble eating by mouth and eating and breathing simultaneously. They also suffered from apnea prematurity, which meant they did not always remember to breathe, but outgrew that condition before being discharged.

"Although the twins progressed in the hospital, they each required insertion of a gastric tube directly into their stomachs for nutrition. [Thomas] was often hard to contact during the twins' hospital stay, but she was trained on how to feed the twins via the gastric tube before their release. Upon discharge, [Thomas] was told not to orally feed the twins and to only use the gastric tube. She was given a feeding schedule and a pump to deliver their meals through the gastric tube slowly over time. If their meals were delivered too quickly, the twins were in danger of vomiting, thus failing to receive their required nutrition. During feedings, it was required that someone be attentive to the twins throughout the process. [Thomas] was offered the assistance of a home nurse

---

**2**      Thomas's second child tested positive for methamphetamine at birth.

because feeding two infants with a gastric tube was difficult. [Thomas] declined the assistance of a nurse.

"Two days after the twins were released, [Thomas] rushed B. back to the hospital because he was having trouble breathing. He was admitted to the hospital for several weeks. During the admission process, [Thomas] was seen feeding K. with a bottle in an elevator. Child protective services intervened and took the twins from [Thomas's] care. The twins were placed back in her care six months later. After the twins returned to [Thomas's] custody, she lived with them and her older children at her parents' home.

"When the twins were nearly a year and one-half old, [Thomas] moved from her parents' home and into an apartment complex where [defendant] lived. [Defendant] was in his early 20's, nine years younger than [Thomas], and did not have children of his own. He lived with friends and [Thomas] often saw him playing with children who lived in the apartment complex. He appeared kind and gentle with them, and the children appeared to like him. After a short time of being neighbors, [defendant] moved in with [Thomas]. Their relationship was somewhat romantic. [Thomas] had sexual intercourse with [defendant] two or three times during their entire relationship and thought of him as more of a roommate.

"Indeed, [Thomas] used [defendant] predominantly for childcare. He was 'helpful' and 'obedient,' appeared 'calm' and 'soft,' but 'evasive.' He did anything [Thomas] needed him to do, including watching the twins when she ran errands. [Thomas] jokingly described [defendant] as her babysitter to several friends. She further said she was with [defendant] only out of convenience because he watched her children. [Thomas] said having [defendant] around allowed her to come and go as she pleased. [Thomas] acted 'rude' and 'mean' toward her children and was not a comforting mother. [Thomas] gave the impression that K. and B. were an inconvenience to her.

"[Defendant] smoked marijuana and purported to suffer from various mental health conditions requiring medication. While he had used heroin before moving in with

4

[Thomas], [defendant's] use increased and he began taking the drug intravenously with [Thomas].

"Shortly after [defendant] and [Thomas] moved in together, B. was rushed to the hospital again for breathing issues. He stayed in the hospital for a month where he had more breathing issues, so a tracheotomy was inserted to help him breathe. B.'s breathing issues were due to a floppy airway that did not always stay open to provide adequate support for breathing and eating. [Defendant] visited B. in the hospital and learned from [Thomas] how to care for and clean B.'s tracheotomy. When B. was released from the hospital, [Thomas] accepted the assistance of a home nurse, who came to the house every weekday for multiple hours to assist with B.'s care. Because of the tracheotomy, B.'s breathing was audible and raspy sounding. It annoyed [Thomas] to hear B. breathing and to clean his tracheotomy.

"By the time the twins were 22 months old, [Thomas], the twins, and [defendant] had moved to a new apartment. While he still required a gastric tube, K. put on quite a bit of weight and was bigger than his brother. He held most, if not all, of his food down and was active and able to walk. B. was not thriving to the same degree as K. B. continued his nutrition via his gastric tube and would often vomit after feedings. [Thomas] usually fed B. by manually injecting nutrition into his gastric tube over a short amount of time, while the home nurse devoted to B.'s care, fed him through a machine that would deliver nutrition slowly. B. could not walk or talk and always appeared low in energy, although happy. The twins would play and climb on each other.

"While living in the new apartment, [Thomas] occasionally used methamphetamine with the apartment manager, sometimes after sneaking out of the apartment in the middle of the night. She lost weight, leading [Thomas's] mother to suspect [she] was using methamphetamine. [Thomas] also met up with the father of her second child on several occasions to buy and use heroin.

5

"In late September or early October of 2016, [Thomas] noticed an oblong burn mark on K.'s foot. [Thomas] told her mother she believed it was caused by K. stepping on a lit cigarette [defendant] left on the ground outside the apartment. [Thomas's] mother told [her] to take K. to the doctor. Also around this time, the apartment manager saw K. and B. all alone walking and crawling, respectively, toward the main street outside the apartment complex. He stopped them and took them back to the apartment, where [Thomas] and [defendant] were sleeping on the couch.

"The apartment manager thought [defendant] was a clingy and jealous boyfriend and was rude to the manager and other men with whom [Thomas] associated. [Defendant] often borrowed the apartment manager's phone to contact [Thomas] when she failed to answer [defendant's] calls. In early October, [defendant] approached the manager and told him he felt like 'he was going to explode, that he was going to lose it.' [Defendant] also referenced needing to go to a mental hospital.

"On October 12, 2016, [Thomas] took the twins to the park to meet a friend, who also brought her children. The friend noticed a large bruise and scratches on B.'s face. B. was also acting 'sad' and appeared to have lower energy than usual. The friend jokingly asked [Thomas] if she was beating her children. [Thomas] responded that she did not know how the injury to B. occurred because she was not home when it happened. [Thomas] said she did not know if [defendant] inflicted the injury, but that it was likely K. who inflicted the injury. The friend did not believe K. inflicted the injury because it was too serious of an injury to have been inflicted by a child.

"[Thomas's] mother also saw the injury to B.'s face that day. [Thomas] told her mother K. probably caused the injury and that it happened while she was at the hairdresser and that [defendant] was watching the twins. When [Thomas's] mother told [Thomas] she should take B. to the doctor, [Thomas] said she did not want to because she did not want child protective services to open a case on her.

6

"On October 13, 2016, [Thomas] left in the morning to go to a methadone clinic. She left the twins with [defendant]. She returned around 1:00 p.m. and then [defendant] left to go to the methadone clinic to get his daily dose. When he returned home, [Thomas] fed the twins and gave each of them melatonin to help them sleep. [Defendant] and [Thomas] then rested together on the couch. [Thomas] left around 3:30 p.m. to get heroin.

"While [Thomas] was gone, [defendant] went to a neighbor's apartment to borrow a cigarette rolling machine. [Defendant] appeared agitated and said he was 'very upset' because somebody was trying to take his family. [Defendant] further said he wanted to beat up somebody. The neighbor encouraged [defendant] to calm down, and then [defendant] went home.

"At 5:08 p.m., [defendant] called [Thomas] and told her K. was not breathing and she needed to come home. She told him to stimulate K. to make him responsive and that she was coming home. [Defendant] responded, 'that would be nice' and abruptly hung up the phone. Thereafter, [Thomas] attempted to call [defendant] multiple times to no avail. She also texted him twice inquiring about K.'s status. [Defendant] ultimately called defendant back at 5:18 p.m., right as [Thomas] was driving into the apartment complex. When she got into the apartment, [Thomas] saw [defendant] performing chest compressions on K. K.'s complexion was gray and his lips were blue. [Thomas] called 911 and took over doing chest compressions and mouth-to-mouth resuscitation. [Defendant] went outside to flag down emergency responders.

"Eventually, police and fire personnel arrived and were able to regain K.'s pulse before taking him to the hospital. [Thomas] and [defendant] were initially questioned at the apartment. During [Thomas's] questioning, she tended to B. who was making loud and raspy sounds while breathing. When asked by a police officer if B. was alright, [Thomas] responded that he always sounded like that. Both [Thomas] and [defendant] were transported to the Citrus Heights Police Department for further questioning. While

7

there, officers again raised concern about B.'s breathing and general inactivity. [Thomas] again assured officers that B. was fine and always sounded that way. Regardless, officers had B. transported to the hospital.

"K. died at 5:48 p.m. His death was caused by strangulation and blunt force trauma. The blunt force trauma likely occurred before K. was strangled because the trauma produced bruising, which could have occurred only while K. had a pulse. It was further unlikely K. had a pulse after being strangled. K. had bruising and scraping on the front of his chest and deep bruising throughout his neck region. He also had bruising on both eye lids and the backside of his head. K. further had bruising to the tissue underneath the bones in his chest, which was likely not the result of chest compressions because of the amount of blood present during the autopsy, suggesting K. was breathing at the time the injury was inflicted. Similarly, there were injuries to K.'s liver that could be associated with chest compressions but for the fact that blood was present suggesting the injury was inflicted while K. was breathing. K.'s death was not accidental and 'the results of the injuries that he sustained would have resulted in death at or about the time that they were inflicted.'

"B. had extensive and numerous injuries, both old and new, indicating he was the victim of ongoing child abuse. His old injuries included four rib fractures and a fracture to his right clavicle. These fractures were at various stages of healing. B. also had a healing injury inside of his mouth. Further, X-rays taken of B. when he underwent a tracheotomy showed he had a healing rib fracture at the time.

"B.'s new injuries included red lines and swelling across his cheek appearing to indicate a slap mark. B. also had a tear to one of his ears, suggesting his ear was stretched so far that it tore. This was likely the product of a punch, slap, kick, or pull. B. also had three signifiers of abusive head trauma, which was consistent with some sort of whiplash or shaking injury. First, B. had retinal hemorrhages or blood vessels that had burst and bled in his eyes. Second, B. had subdural hemorrhages, or blood on his brain,

8

and intraventricular bleeding, meaning bleeding in the brain. The blood in B.'s brain was such a critical problem that it required placement of a drain for a week to release the blood and relieve pressure in B.'s skull. With such an injury, children typically present with vomiting, irritability, change in cry, fussiness, apparent pain, sleepiness, or refusing to sleep because of pain. Due to this injury, B. suffered from widespread low oxygen throughout his brain that killed brain cells and altered his brain permanently. This injury also caused B. to experience problems with his breathing. Third, B. had vitreous hemorrhages, meaning blood in the middle or 'jelly' of the eye. This manifested itself in B. through swelling, broken blood vessels, and a blood blister in his eye. The most common cause of this type of injury is blunt force trauma to the eye.

"Also new were external and internal injuries to B.'s torso and abdomen. He had several bruises to the front of his chest overlying his sternum and ribs. Internally, B. had fractures along the front ends of his right and left ribs that met his sternum, meaning his sternum had detached from his rib cage. This was an incredibly unusual and significant break that likely resulted from a significant push or blunt force trauma to the sternum and would have been extremely painful. The broken ribs caused a small laceration to B.'s heart. This resulted in his heart not being able to pump properly and a significant amount of blood to accumulate in and around B.'s heart that required draining. The rib fractures also caused two liver lacerations and a laceration to the spleen, resulting in further bleeding into B.'s abdomen and pelvis. Because of the significant bleeding, B. required multiple blood transfusions. The trauma causing the rib fractures also caused bruising to B.'s lungs. A common accidental cause of these injuries would be a car crash, where the victim was not restrained and had been thrown from the car. Another accidental explanation would be that B. had been trampled by a horse." (*Thomas, supra*, 63 Cal.App.5th at pp. 615-621.)

Defendant's grandmother testified at trial that the apartment manager confronted defendant at her house after K.'s death and B.'s hospitalization. During that

9

confrontation, defendant said he loved the twins and that he did not know what happened but did everything he could to save K. She testified that she did not recall whether it was the apartment manager or defendant, but one of them said something about not wanting to call 911 at the time K. was in distress because he did not want child protective services "up [Thomas's] ass." Defendant's grandmother also recounted defendant's statements to her about what had happened in the moments before he noticed K. was in distress.

When questioned by the prosecution, defendant's grandmother admitted to financing his defense attorney. She further testified she was telling the truth and only wanted defendant to have a good defense because she did not believe he did anything to harm K. and B. Also when questioned by the prosecution whether she asked police officers "why a mother of four in her 30s would leave [defendant] alone with the children when he's diagnosed with bipolar and on methadone," defendant's grandmother testified she did not recall making that statement, but did recall "wanting to know why a mother of four, an experienced mother of four, and 34 [years of age], would be with a 23-year-old. And if I had two special needs children, I wouldn't leave them with somebody [who] was less than a nurse." A transcript of defendant's grandmother's interview with a police officer did not include statements regarding defendant's mental health condition.

II

*Defendant's Statements*

"[Defendant] gave several statements to police and made several unsolicited statements in their presence. While in the apartment after officers first responded to the 911 call, [defendant] expressed fear he would be blamed for K.'s injuries and death because he was the only person around when K. became unresponsive. He expressed these same fears during several police interviews.

"During his police interviews, [defendant] claimed that after [Thomas] left to get heroin, he buckled the twins in chairs. He sat in the living area of the apartment and looked in on them occasionally. Later in the afternoon, he let them out of the chairs to

10

walk around. He made coffee and went outside to have a cigarette and did not pay attention to the twins for nearly 15 minutes. When he came inside, K. was on the floor of the twins' bedroom and appeared to be in severe distress. [Defendant] put B. in his crib and called [Thomas] to tell her K. was not breathing. [Defendant] then began giving K. chest compressions but did not call 911. He did not answer [Thomas's] phone calls and texts because he was busy giving K. chest compressions." (*Thomas, supra*, 63 Cal.App.5th at pp. 622-623.)

Regarding drug use, defendant admitted during his interviews to using heroin both before and after meeting Thomas. Defendant also admitted to taking prescription methadone daily and regularly smoking marijuana.

Defendant made multiple statements regarding his mental health. During defendant's initial police interview, before he knew K. had died, he appeared nervous to police officers. When questioned about that fact, defendant said he just wanted K. to survive and that he needed "to pull it together 'cause [he has] mental health issues sometimes . . . ." At the next police interview later that night, defendant claimed to be "severely bipolar" and could be "upset one moment and then crying and then kind of snap back to reality . . . ." He also said that, although it sounded selfish, he was worried about what was going to happen to him since he was the only person around when K. was in distress. He said he was not responsible for what happened to the twins. He further said he was doing pretty well at holding his composure and promised the officers he would not hurt himself. The officers offered defendant a suicide prevention card because they were concerned about his mental health. Defendant assured them that if he felt unstable he would check himself into a mental health facility as he usually did when he felt like he could not control himself.

After leaving the police station, defendant went back to the apartment complex he lived at with Thomas. Upon hearing of K.'s death, defendant told the apartment manager

11

he wanted to curl into a ball and take a big shot.  The apartment manager understood defendant's statements to mean defendant wanted to end his own life.

During defendant's police interview several days after K.'s death, defendant told officers he "could never [hurt the twins].  I have done (unintelligible) like I -- when you gave me that suicide prevention card the other night . . . [¶] . . . I -- I played it off like I was, you know, I -- I --I would never in my whole life consider suicide.  [Redacted].  It's the most selfish thing that you could do.  And it didn't cross my mind.  It's just, I -- I was going to check myself into a mental health facility again.  And just to have some clarity for a minute and just to be able to -- not to make sure that I wouldn't go out and do anything crazy, it's just I went for a drive that night after -- after I got home, I got in the car and I actually just went on a drive and I -- I decided that, you know, my life is special, you know.  And I have a lot to live for, you know.  This is devastating, but I have to move on and I have to be able to live my life, you know."

III

*Thomas's Statements*

"[Thomas] gave multiple statements to police and testified at trial.  In each instance she stressed that she loved and cared for her children and would never hurt them.  She believed [defendant] treated her children well.  She had never seen him act aggressively toward them or injure them in any way.  If she had seen him hurt the twins, she would have never left them alone with him or been in a relationship with him.

"[Thomas] also repeatedly stated that she feared child protective services and worried that any interaction with child protective services would result in her children being taken from her.  Much of this fear stemmed from [Thomas's] past interactions and removal of all her children at one point or another.  For instance, B. and K. were removed from her care when they were infants and shortly after they were released from the intensive care unit.  Their removal was because a nurse saw [Thomas] feed K. with a bottle in an elevator.  [Thomas] believed she was allowed to feed the twins in this way

12

because that was how the twins were fed while in the intensive care unit and a nurse had told her it was acceptable when the twins were discharged. The twins were returned once [Thomas] had completed drug and alcohol classes, which included biweekly drug tests, and training on how to properly feed them.

"Although [defendant] had mentioned to her that he suffered from various mental health conditions and took medication, she had never seen him have any breakdowns or episodes that would lead her to believe he posed a risk to the twins. She believed he was exaggerating. [Defendant] also began using drugs more heavily once he met [Thomas] and she introduced him to people who could get him drugs.

"As for the old injuries to K. and B., [Thomas] claimed none of those injuries happened in her presence and that she always believed they happened through rough play with each other or because the children climbed on furniture in the house. She always encouraged K. and B. to play rough with each other. She did this because she wanted them to grow up strong. During police interviews, [Thomas] claimed that K. would often hold his breath until his lips turned blue and spots appeared on his face. When she asked doctors about this, they told her K.'s behavior was likely a stress response. She claimed she gave K. and B. melatonin on the day of the incident because they had both been sick for several days and had not slept well the night before. While the twins' doctors never recommended she give them melatonin, her friend told her that a doctor recommended its use for her child as a sleep aide." (*Thomas, supra*, 63 Cal.App.5th at pp. 621-622.)

Thomas further testified that she and defendant had used methamphetamine together once at least a month before K.'s death. They also used heroin several times together.

IV

*Trial Proceedings*

"At trial, the prosecutor's theory of the case was that [defendant] strangled K. to death and that [Thomas] left K. with a person she knew to abuse her children. Because

13

the injuries to B. were of varying ages, the prosecution pursued a theory that either [Thomas] or [defendant] was responsible for the infliction of those injuries.

"[Defendant's] defense was that [Thomas] inflicted all the injuries on the twins and that he was innocent of the crimes charged. As to K., he argued [Thomas] strangled him before she left to get heroin and the strangulation did not cause K. to be in distress until [defendant] was alone with K. [Defendant] elicited from the pathologist the concept of delayed strangulation, meaning that a person could be strangled in a way that did not immediately result in death. Instead, the strangulation would cause an internal injury, such as a damaged artery, or condition, such as a blood clot, that would take time to materialize and cause death. The pathologist believed K. died at the time he was strangled and was not the victim of delayed strangulation. While studies purporting to credit delayed strangulation as a cause of death found an internal injury or condition in the subjects of their studies, the pathologist did not find any internal injury or condition in K. other than the strangulation itself. The jury found [defendant] not guilty of the first degree murder of K., but guilty of second degree murder. It also found [defendant] guilty of assault of K., a child under eight years old, by means of force likely to produce great bodily injury resulting in death, and of permitting B., a minor child, to suffer unjustifiable physical pain and mental suffering." (*Thomas, supra*, 63 Cal.App.5th at p. 623.)[3]

---

[3] "The jury found [Thomas] not guilty of the first degree murder of K., but guilty of second degree murder. The jury further found [Thomas] not guilty of the assault of K. resulting in death, but guilty of the lesser included offense of assault of K. with force likely to cause great bodily injury. It found, as to both K. and B., [Thomas] guilty of permitting a minor child to suffer unjustifiable physical pain and mental suffering. Specifically as to K., it further found the allegation true that [Thomas], while having the care and custody of K., and under circumstances likely to cause great bodily harm or death, willfully caused or permitted K. to be injured or harmed and that injury or harm resulted in death." (*Thomas, supra*, 63 Cal.App.5th at pp. 623-624.)

14

The trial court imposed an aggregate prison term of 25 years to life, plus six years. The sentence was composed of 25 years to life for the assault of K. resulting in death, and six years for permitting B. to suffer unjustifiable physical pain. The trial court further imposed, then stayed pursuant to Penal Code section 654, a 15-year sentence for second degree murder.

Defendant appeals.

## DISCUSSION

### I

*It Was Not Error For The Prosecutor To Question*

*Defendant's Grandmother About Whether She Paid Defendant's Legal Fees*

Defendant contends the prosecution committed prejudicial error by eliciting evidence from his grandmother that she paid for his defense. Defendant argues this questioning amounted to error because it interfered with the attorney-client relationship and because it revealed confidential attorney-client communications. We disagree.

### A

*Background*

At trial defendant's grandmother testified regarding defendant's behavior on the days after K.'s death. The prosecution questioned defendant's grandmother about her potential bias towards her grandson and whether she paid for "some of his defense . . . ." Defendant objected and the court deferred ruling on the objection. Over several days and in different contexts, defendant argued that questions regarding defense counsel's payment infringed upon his Sixth Amendment right to counsel because the questions implied counsel was representing defendant only because she was being paid to do so. Defendant further argued the evidence was irrelevant because it did not tend to show his grandmother's bias. The court disagreed and ultimately allowed the jury to consider evidence that defendant's grandmother paid for his defense costs.

15

B

*There Was No Prosecutorial Error*

"A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial [error] under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury. Furthermore, and particularly pertinent here, when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Morales* (2001) 25 Cal.4th 34, 44.)

Unlike defendant, we do not believe the jury construed the prosecutor's questioning in a way meant to undermine the credibility of counsel such that counsel turned "from an asset into a liability." The prosecutor's statements were aimed at establishing the level of defendant's grandmother's bias. The prosecutor asked about the payment of legal costs after defendant's grandmother testified to the version of events defendant had told her in the days and weeks following K.'s death. Given the context of the prosecutor's questions, it is not reasonable the jury understood the prosecutor's questions pertaining to the payment of defense costs as impugning defense counsel's credibility or role in the criminal justice process.

Defendant disagrees and argues the prosecutor's questioning pertaining to the payment of defense costs rendered his trial fundamentally unfair because it interfered with the relationship with his attorney, thus violating his Sixth Amendment right to counsel. In support of this argument, defendant cites *People v. Velasco-Palacios* (2015) 235 Cal.App.4th 439 (*Velasco-Palacios)* and *Barber v. Municipal Court* (1979) 24 Cal.3d 742 (*Barber*).

16

In both *Velasco-Palacios* and *Barber* the cases against the defendants were dismissed because of prosecutorial interference with the attorney-client relationship. (*Velasco-Palacios, supra*, 235 Cal.App.4th at pp. 449-450; *Barber, supra*, 24 Cal.3d at pp. 759-760.)  In *Velasco-Palacios* the prosecutor falsified incriminating statements in the transcript of defendant's police interview causing defense counsel to advise defendant to settle the case.  (*Velasco-Palacios*, at pp. 442-443.)  Even though the falsified statements were later revealed to the defendant and counsel, the tarnish to the relationship between attorney and client was so severe that a fair *retrial* would be impossible.  (*Id.* at pp. 443, 447-448.)

Similarly, in *Barber* the prosecution tarnished the attorney-client relationship by placing an undercover officer among a group of demonstrators participating in a " 'sit-in' " at a nuclear power plant.  (*Barber, supra*, 24 Cal.3d at p. 745.)  After being arrested with some of the demonstrators, the undercover officer was charged along with the defendants and remained part of the defense team for several months.  (*Id.* at pp. 747-749.)  Throughout those months, the undercover officer discussed trial strategy with the codefendants and counsel.  (*Id.* at p. 749.)  Our Supreme Court concluded dismissal was the only appropriate remedy reasoning:  "The intrusion, through trickery, of the law enforcement agent in the confidential attorney-client conferences of [the defendants] cannot be condoned.  The right to confer privately with one's attorney is 'one of the fundamental rights guaranteed by the American criminal law -- a right that no legislature or court can ignore or violate.' "  (*Id.* at pp. 759-760.)

Here, the prosecutor did not tamper with evidence nor elicit the defense strategy from defendant's grandmother.  Further, the prosecutor did not engage in trickery or surprise.  Defendant already knew his grandmother paid his attorney fees, thus the relationship between defendant and his counsel was already influenced by that fact.  There is simply no analogy to *Velasco-Palacios* and *Barber*.

Defendant further asserts that the payor of a legal services bill is protected by the attorney-client privilege, and the introduction of that privileged information into evidence constituted prosecutorial error.  Defendant cites *Los Angeles County Board of Supervisors* for the proposition that the fee agreement between defendant's grandmother and his attorney was privileged information.  (*Los Angeles County Bd. of Supervisors v. Superior Court* (2016) 2 Cal.5th 282.)  In *Los Angeles County Board of Supervisors*, our Supreme Court held that certain content in an invoice for legal fees could be privileged, but that the privilege extended only to communications "conveyed 'for the purpose of . . . legal representation' -- perhaps to inform the client of the nature or amount of work occurring in connection with a pending legal issue -- such information lies in the heartland of the attorney-client privilege." (*Id.* at p. 297.)

In the context of defendant's trial, the identity of the person paying his legal fees had no bearing on the work being done in connection *with the legal issues* of his case.  Even if the fee arrangement suggested a level of coordination between defendant's grandmother and counsel as defendant argues, that suggestion has nothing to do with counsel's representation on the substantive issues presented in the case.  Thus, defendant's grandmother's payment of his legal fees is not protected under the attorney-client privilege.  Accordingly, there was no prosecutorial error.

II

*Issues Related To Defendant's Mental Health Condition And Drug Use*

Defendant puts forth a cumulative error argument related to the admission of multiple pieces of evidence and the prosecutor's argument regarding those pieces of evidence.  All the pieces of evidence pertained to defendant's mental health and drug use.  Defendant argues it was error for the prosecutor to argue, based on these pieces of evidence, that defendant had the character of a murderer.

18

## A

### *Evidentiary Claims*

We review a trial court's rulings on the admissibility of evidence for abuse of discretion. (*People v. Benavides* (2005) 35 Cal.4th 69, 90.)

### 1

### *The Court Did Not Abuse Its Discretion By*
### *Admitting Evidence Of Defendant's Suicidal Ideations*

Defendant argues the trial court abused its discretion by admitting into evidence his statements pertaining to suicide made to the apartment manager and to police officers. Defendant argues this evidence was irrelevant to prove consciousness of guilt and thus the trial court's admission of the testimony for that purpose was error. We disagree.

Recently, in *Pettigrew*, Division Two of the Fourth District recognized that suicide attempts have long been considered relevant on the issue of consciousness of guilt, especially when attempted for the purpose of evading prosecution. (*People v. Pettigrew* (2021) 62 Cal.App.5th 477, 498.) Defendant disputes the *Pettigrew* court's observation and further argues his statements do not amount to an intent to evade prosecution or even to commit suicide.

We begin with defendant's statements in his police interviews the night of K.'s death. There, before learning of K.'s death, defendant assured officers that he did not plan to harm himself, but did so while also telling officers he had a history of extreme mood swings and losing control and was currently trying to "pull it together." A reasonable inference from defendant's statements is that he feared he may harm himself, or commit suicide, because of his mental health history and current emotional state. Defendant's insinuations of harming himself were made as part of a larger dialogue about his fear he would be blamed for K.'s injuries and his refusal to take responsibility for K.'s injuries. Taken in context, defendant's statements could reasonably be understood as connected to his fear of being prosecuted or otherwise held responsible for K.'s death.

As to defendant's statements to the apartment manager, we disagree with defendant that it was outside the apartment manager's knowledge that defendant told him he wanted to end his life when, after learning of K.'s death, defendant said he wanted to curl up in a ball and take a big shot. The apartment manager was a party to the conversation and privy to the context in which defendant made his statements, and thus was qualified to testify to his interpretation of defendant's meaning. Further, the apartment manager testified about the context of defendant's statements, allowing the jury to judge for itself whether the apartment manager's interpretation was accurate. Similarly, defendant's statements in his later interview that he drove around after receiving the suicide prevention card and learning of K.'s death and ultimately concluded he would never take his own life because his "life [was] special," implied defendant contemplated suicide while on his drive but decided against it.

Defendant's contemplation of suicide statement to the apartment manager and his contemplation of the same during his subsequent drive occurred shortly after learning of K.'s death and after defendant had already expressed a fear of being held responsible and refused to take responsibility for K.'s injuries. A reasonable inference from this evidence is that defendant's contemplations of suicide were motivated, in part, by an effort to escape prosecution or responsibility for K.'s death. That this evidence leads to other reasonable inferences is of no matter, it was for the jury to determine which inference was the most reasonable. (See *People v. Landry* (2016) 2 Cal.5th 52, 87-88 [conflicting inferences drawn from a piece of evidence go to its weight, not its admissibility].)

Further, defendant's contemplations of suicide were sufficient to justify a consciousness of guilt inference based on a theory of flight and we need not decide whether contemplation of suicide or suicide attempts are relevant to demonstrate a defendant's general consciousness of guilt. Contemplation of escape through physical flight as a means of avoiding prosecution is no different than contemplation of escape through suicide as a means of avoiding prosecution because the objective is the same. It

20

is the objective of avoiding prosecution that allows for the consciousness of guilt inference.  (See *People v. Leon* (2015) 61 Cal.4th 569, 607 [" ' " [F]light requires neither the physical act of running nor the reaching of a far-away haven.  [Citation.]  Flight manifestly does require, however, a purpose to avoid being observed or arrested.' " ' "].)  Here, defendant's contemplations of suicide were made under circumstances permitting for an inference he was motivated by an attempt to avoid responsibility for K.'s death and B.'s injuries.  Accordingly, the trial court did not abuse its discretion by admitting evidence of defendant's contemplations of suicide.

2

*The Trial Court Did Not Abuse Its Discretion By*

*Admitting Evidence Defendant Purported To Have A Bipolar Diagnosis*

Defendant contends the trial court admitted improper character evidence by permitting the prosecution to introduce testimony defendant had a bipolar diagnosis and a history of mental health treatment.  Specifically, defendant challenges the admission of his statements during a police interview that he was severely bipolar and would check himself into a mental health facility "again."  He also challenges the prosecutor's impeachment of his grandmother with her prior statement questioning why Thomas would leave health-challenged children with someone who was bipolar.

The trial court admitted defendant's statements during his police interview as relevant to show his state of mind.  (*People v. Kovacich* (2011) 201 Cal.App.4th 863, 885 [a statement circumstantially showing the declarant's state of mind is admissible when, " 'whether the statement is true or not, the fact such statement was made is relevant to a determination of the declarant's state of mind' "].)  Defendant does not challenge this ruling on appeal and we conclude there was no abuse of discretion.  The fact defendant self-described as severely bipolar and indicated he had a history of mental health treatment was relevant to a determination of defendant's mental state when being interviewed by officers and during the offenses.  That the defendant would point to a

21

mental health condition as the source of erratic behavior and instability, whether true or not, shows his mental state at the time of the police interviews was to shift blame for conduct officers attributed to him to forces outside of his control.

Similarly, defendant does not challenge the trial court's reasons for permitting the prosecution to question his grandmother with her prior statement. The court allowed the questioning for impeachment purposes because defendant's grandmother testified she believed defendant was innocent. Her prior statement demonstrates that at one time she questioned defendant's ability to safely care for the twins, thus impeaching her testimony. There was no abuse of discretion.

3

*The Trial Court Did Not Abuse Its Discretion By*

*Admitting Evidence Of Defendant's Prior Use Of Methamphetamine*

Defendant contends the trial court's admission of evidence of his single use of methamphetamine two months before K.'s death was far more prejudicial than probative, as was his expert's testimony on the topic elicited during cross-examination. Defendant argues the evidence constituted character evidence given the lack of evidence demonstrating he had care or custody of K. and B. at the time of his drug use.[4] We disagree.

"The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) "Evidence is relevant if it tends ' "logically, naturally, and by reasonable inference" to establish material facts . . . .' "

---

[4]    In his opening brief, defendant also raises an issue pertaining to the court's exclusion of similar evidence regarding Thomas. He withdraws that argument in his reply brief.

22

(*People v. Williams* (2008) 43 Cal.4th 584, 633.) "Prejudice for purposes of Evidence Code section 352 means evidence that tends to evoke an emotional bias against the defendant with very little effect on issues, not evidence that is probative of a defendant's guilt." (*People v. Crew* (2003) 31 Cal.4th 822, 842.) " ' "The prejudice that [Evidence Code] section 352 ' "is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence." [Citations.] "Rather, the statute uses the word in its etymological sense of 'prejudging' a person or cause on the basis of extraneous factors." ' " ' " (*People v. Tran* (2011) 51 Cal.4th 1040, 1048.)

Evidence of defendant's single instance of methamphetamine use two months before K.'s death reasonably tended to show Thomas's knowledge of defendant's drug-use around the twins and Thomas's acceptance of that conduct. While defendant singles out his lone instance of methamphetamine use, the evidence established defendant and Thomas also used heroin together and that defendant often smoked marijuana and left the house for periods of time to smoke marijuana and tobacco cigarettes. These inferences were relevant to defendant's charge for permitting B. to suffer unjustifiable physical pain and mental suffering and Thomas's charge for the same offense as to B. and as to K. (Pen. Code, § 273a, subd. (a) ["Any person who, under circumstances or conditions likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of that child to be injured, or willfully causes or permits that child to be placed in a situation where his or her person or health is endangered, shall be punished by imprisonment in a county jail not exceeding one year, or in the state prison for two, four, or six years."].)

We disagree with defendant that the evidence failed to demonstrate he cared for K. and B. at the time of his methamphetamine use. The evidence established Thomas and defendant moved in with one another shortly after they met when the twins were 18 months old. Beginning at that time, Thomas used defendant for childcare purposes, and

23

she rarely used others to watch the twins in her absence. Thus, it was reasonable to infer from the evidence that two months before K.'s death at 22 months old, when Thomas and defendant together used methamphetamine, the twins were under both defendant's and Thomas's care. The evidence is even more relevant to establish the type of circumstances and conditions Thomas permitted her children to be around. Indeed, the evidence established that Thomas was the more active and consistent drug user compared to defendant. The evidence also established defendant partook in the same behaviors as Thomas, whether that be heroin use or methamphetamine use, although to a lesser extent. Even so, the conduct was modeled by Thomas and condoned by her. Defendant's single use of methamphetamine two months before K.'s death served as an example of defendant's engagement in the conduct condoned by Thomas and established that Thomas knew defendant engaged in such conduct when caring for her children. Given these logical inferences, we further disagree with defendant that there was no foundation to generally link defendant's methamphetamine use with child neglect.

As to prejudice, defendant points in large part to his expert's testimony during cross-examination that a single use of methamphetamine could lead to aggressive behavior including domestic violence. Defendant misrepresents the record. While his expert did say a single instance of methamphetamine use could lead to aggressive behavior, the expert qualified that statement by saying it was extremely rare and that the side effects of methamphetamine use typically dissipated once the drug had worked itself out of a user's blood stream. Thus, we disagree that the evidence led to the prejudicial inference that because defendant used methamphetamine a single time months before K.'s death, defendant was aggressive and prone to commit violence. Accordingly, there was no abuse of discretion.

24

## B

### *There Was No Prosecutorial Error During Closing Argument*

Defendant contends the prosecutor relied on inadmissible and nonexistent evidence in closing argument to contend defendant's mental health condition and drug use explained why he was the person who murdered K. and assaulted B.

As described *ante*, "A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial [error] under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury. Furthermore, and particularly pertinent here, when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Morales, supra*, 25 Cal.4th at p. 44.)

"[I]t is misconduct for the prosecutor to state facts not in evidence or to imply the existence of evidence known to the prosecutor but not to the jury." (*People v. Smith* (2003) 30 Cal.4th 581, 617.) However, "[c]ounsel may argue facts not in evidence that are common knowledge or drawn from common experiences." (*People v. Young* (2005) 34 Cal.4th 1149, 1197.) " ' "It is settled that a prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom." ' " (*People v. Sandoval* (2015) 62 Cal.4th 394, 439.)

Defendant's first claim of error pertains to the prosecutor's closing argument that "in view of appellant's drug and mental health history . . . , it was negligent child endangerment for Ms. Thomas to leave the children in the care of [defendant], like leaving the children on the tracks in the path of an oncoming train." To defendant "this argument was a straw man [because] Ms. Thomas' long-standing pattern of negligence

25

and child abuse was shown in stark reality, entirely apart from her arrangement with appellant. [¶] In reality, the argument was aimed at the asserted but improper connection between [defendant's] past drug and mental health problems, and his alleged conduct which harmed the twins." Defendant argues it was improper for the prosecutor to make this argument for two reasons. First, because the argument is based on inadmissible evidence of defendant's suicidal ideations, mental health diagnosis and treatment, and methamphetamine use. And second, because the inference the prosecutor asked the jury to draw -- that defendant was an oncoming train -- was not a permissible inference considering the reasons the court admitted the evidence.

As we concluded *ante*, evidence of defendant's suicidal ideations, self-proclaimed mental health diagnosis and treatment, and his single use of methamphetamine was all admissible evidence. Thus, the prosecutor did not commit prosecutorial error by referencing those items of evidence in closing argument. Neither did the prosecutor commit prosecutorial error by comparing defendant to an oncoming train based on evidence of his mental health condition and drug use as defendant contends. He argues the prosecutor's argument was improper because it was contrary to the evidence, which demonstrated he was a shy and gentle person and not aggressive. We disagree.

Defendant's neighbor testified defendant was agitated and aggressive when speaking to him a short time before K.'s death. The apartment manager also testified to instances when defendant claimed he was going to "explode" or "lose it" and needed to seek mental health care. Further, the evidence established B. was the victim of unknown abuse in the weeks and months preceding K.'s death. These injuries occurred simultaneous to defendant's drug use (whether that be heroin, methamphetamine, marijuana, or methadone) and while defendant told Thomas, as well as others, about his struggles with a mental health condition and the aggression associated with it. Thus, while it is possible Thomas was the source of the twin's abuse, the evidence was

26

susceptible to multiple interpretations. Accordingly, the prosecutor's argument was a fair comment on the evidence.

Further, it is not reasonable that a jury would interpret the argument as defendant does -- that simply because defendant suffered from a mental health condition and addiction, he was an aggressive killer. The prosecutor's argument was made when discussing Thomas's knowledge of the conditions in which she was leaving the twins when she left them alone with defendant. The prosecutor's argument was that Thomas knew the environment was unsafe given what defendant disclosed regarding his mental health condition and what Thomas knew of defendant's drug use. When it came to whether defendant inflicted fatal injury to K., the prosecutor pointed to the science. Defendant was the only person around the children at the time the pathologist testified K.'s strangulation occurred, and defendant's defense of delayed strangulation was unavailing. The prosecutor did not rely on defendant's mental health condition or drug use when making this argument, except to say that defendant appeared upset and said he wanted to fight somebody shortly before K.'s injuries were inflicted. Thus, it is not reasonable the jury understood the prosecutor's argument to mean that it could convict defendant of murder and assault based simply on the fact that defendant had a mental health condition and used drugs.

Defendant lastly argues the prosecutor committed misconduct during closing argument by arguing defendant's grandmother believed he should not be left alone with children because he was bipolar. Defendant contends his grandmother's statement was not admitted into evidence, and thus it was improper for the prosecutor to reference that statement. The People appear to concede the statement was not contained in the recording of defendant's grandmother's police interview, but argue, the evidence was admitted through other means. Not so.

The People cite to defendant's grandmother's testimony, where she said that she did not recall making a statement to police questioning why Thomas would leave her

27

children with somebody who was bipolar and on methadone but did recall saying she would never leave two special needs children with anybody less than a nurse. No item of evidence cited by the People or that we could locate in the record affirmatively showed defendant's grandmother linked his mental health condition with his ability to care for children.

Even so, the jury was instructed it could not consider the argument of counsel or the questions posed to witnesses as evidence. The jury was further instructed it must consider only evidence when determining whether defendant was guilty of the charged crimes. In the jury's review of the recording, which the prosecutor urged it to do, the jury could determine for itself whether defendant's grandmother believed defendant posed a risk to children based on his mental health condition. The prosecutor's argument did not imply to the jury that evidence outside the recording existed demonstrating defendant's grandmother made the alleged statements. Indeed, the prosecutor pointed the jury to the recording as the exclusive support for the argument. Accordingly, to the extent the prosecutor erred by arguing that defendant's grandmother believed he posed a risk to children, that error was harmless under any standard. (*People v. Rivera* (2019) 7 Cal.5th 306, 334 [prosecutorial error under federal law requires reversal if the error was not harmless beyond a reasonable doubt]; *People v. Martinez* (2010) 47 Cal.4th 911, 955 ["under our state law, prosecutorial [error] is reversible error where . . . ' "it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct" ' "].)

C

*There Was No Cumulative Error*

Defendant contends the cumulative effect of the errors related to his mental health condition and drug use deprived him of due process and a fair trial in violation of his federal and state constitutional rights. "Under the 'cumulative error' doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial."

28

(*In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32.) Because we have concluded the one instance of presumed error was harmless and no other instance of error occurred, we conclude there was no cumulative error.

III

*The Trial Court Properly Instructed The Jury Regarding Accomplice Corroboration*

The jurors were instructed that "[b]efore [they] may consider the statements of . . . Thomas as evidence against [defendant], or consider the statements of [defendant] as evidence against Thomas, [they] must decide whether [defendant] and Thomas were accomplices to those crimes. [¶] A person is an accomplice if he or she is subject to prosecution for the identical crime charged against the other defendant. [¶] Someone is subject to prosecution if: One, he or she personally committed the crime; or, two, he or she knew of the criminal purpose of the person who committed the crime, and he or she intended to, and did, in fact . . . facilitate, promote, encourage, or instigate the commission of the crime. [¶] An accomplice does not need to be present when the crime is committed. On the other hand, a person is not an accomplice just because he or she is present at the scene of the crime, even if he or she knows the crime will be committed, or is being committed and does nothing to stop it.

"If you decide that the codefendant was not an accomplice, then supporting evidence is not required, and you should evaluate his or her statement as you would that of any other witness. [¶] If you decide that the codefendant was an accomplice, then you may not convict the other codefendant based on the accomplice's statements alone. You may only use the statements of an accomplice to convict the defendant only if, one, the accomplice's statement is supported by other evidence that you believe; two, the supporting evidence is independent of the accomplice's statement; and, three, the supporting evidence tends to connect the defendant to the commission of the crimes. Supporting evidence, however, may be slight. It does not need to be enough by itself to prove that the defendant is guilty of the charged crimes, and it does not need to support

29

every fact mentioned by the accomplice in the statement. [¶] On the other hand, it is not enough if the supporting evidence merely shows that a crime was committed or the circumstances of its commission. The supporting evidence must tend to connect the other defendant to the commission of the crime. [¶] Any statement of an accomplice that tends to incriminate the defendant should be viewed with caution. You may not, however, arbitrarily disregard it. You should give that statement the weight you think it deserves after examining it with care and caution and in light [of] all the other evidence."

Defendant contends the trial court erred by instructing the jury concerning accomplice corroboration, not because the instruction was legally incorrect, but because it "cement[ed] the prosecution argument that the defendants acted in concert." He also contends there was no evidence to support the giving of the instruction because the evidence did not establish that defendant perpetrated the abuse of B. or aided and abetted Thomas's abuse of B.

"We review a claim of instructional error de novo." (*People v. Fiore* (2014) 227 Cal.App.4th 1362, 1378.) "Whether or not the trial court should have given a 'particular instruction in any particular case entails the resolution of a mixed question of law and fact,' which is 'predominantly legal.' [Citation.] As such, it should be examined without deference." (*People v. Hernandez* (2013) 217 Cal.App.4th 559, 568.) " 'An instruction is argumentative when it recites facts drawn from the evidence in such a manner as to constitute argument to the jury in the guise of a statement of law.' " (*People v. Battle* (2011) 198 Cal.App.4th 50, 85.) It is also " 'an instruction "of such a character as to invite the jury to draw inferences favorable to one of the parties from specified items of evidence." ' " (*People v. Panah* (2005) 35 Cal.4th 395, 486.) Such an inference "affects the application of the 'beyond a reasonable doubt' standard only if, under the facts of the case, there is no rational way the trier could make the connection permitted by the inference." (*County Court of Ulster County, N. Y. v. Allen* (1979) 442 U.S. 140, 157 [60 L.Ed.2d 777, 792].)

Defendant cites *People v. Avila* (2006) 38 Cal.4th 491, 562 (*Avila*), *People v. Box* (2000) 23 Cal.4th 1153, *People v. Alvarez* (1996) 14 Cal.4th 155, and *People v. Coffman and Marlowe* (2004) 34 Cal.4th 1, for the proposition that the instruction is argumentative and should not be given when a defendant requests it not be given. In *Avila,* our Supreme Court said: "We have discussed in several cases the issue of how the jury should be instructed to view the testimony of an accomplice who is also one of multiple defendants in a single criminal trial. In *People v. Hill* (1967) 66 Cal.2d 536, [556], where a confessing codefendant was an accomplice as a matter of law, we held the trial court did not err in leaving to the jury the determination of his role as an accomplice, thus avoiding imputations of guilt of the other two codefendants which might have flowed from the court's direction that the confessing codefendant was an accomplice as a matter of law. [Citation.] In *People v. Terry* (1970) 2 Cal.3d 362, [399], we held that, generally, instructions on accomplice testimony must be given on the court's own motion only when the accomplice witness is called by the prosecution or when a defendant, in testifying, implicates his codefendant while confessing his own guilt. But 'where a defendant testifies in his own behalf and denies guilt while incriminating a codefendant, it is at most for the discretion of the trial judge whether to give accomplice testimony instructions on his own motion.' [Citation.]

"After the trial in this case, we decided [*People v.*] *Alvarez, supra*, 14 Cal.4th 155. There, we held the trial court did not err in giving accomplice instructions, where two codefendants each testified in his or her own behalf, denied guilt, and incriminated the other to some extent. We explained that the testimony of an accomplice who testifies against a defendant deserves 'close scrutiny' because 'he has the motive, opportunity, and means to attempt to help himself at the other's expense,' and that this rationale 'remains true when the accomplice who testifies against a defendant is himself a defendant.' [Citation.]

"Similarly, in *People v. Box, supra*, 23 Cal.4th 1153, [1209], we held the trial court should have instructed the jury that codefendant Flores's testimony should be viewed with care and caution to the extent it tended to incriminate the defendant. Just as in the case of an accomplice who testifies for the prosecution, Flores's testimony in his own defense was subject to the taint of an improper motive -- promoting his own interest by inculpating the defendant. Accordingly, we held there was no persuasive reason not to require an instruction that an accomplice's testimony should be viewed with care and caution when requested by a defendant in a case where the codefendant testified." (*Avila, supra*, 38 Cal.4th at pp. 561-562.) For the same reasons, our Supreme Court held that the instruction pertaining to accomplice corroboration was properly given in *Coffman and Marlowe*, where the prosecution argued the defendants were accomplices and both the defendants blamed the other for the offense during their testimony. (*People v. Coffman and Marlowe, supra*, 34 Cal.4th at pp. 104-105.)

In *Avila*, the trial court refused to give an instruction pertaining to accomplice corroboration over the nontestifying defendant's objection out of fear the jury would view the testifying defendant's testimony with caution when determining the testifying defendant's guilt. (*Avila, supra*, 38 Cal.4th at pp. 560-561.) Our Supreme Court recognized that "decisional law existing at the time of [the defendants'] trial recognized it was within the trial court's discretion not to give accomplice instructions with respect to [a testifying defendant's] testimony. But *Alvarez* and *Box* make clear that a trial court should instruct the jury that, to the extent a codefendant's testimony tends to incriminate a defendant, it should be viewed with care and caution and is subject to the corroboration requirement." (*Id.* at p. 562.) Accordingly, our Supreme Court analyzed whether the failure to give the instruction pertaining to accomplice corroboration was harmless. (*Ibid.*)

Defendant argues his case is different than the cases he cites because both he and Thomas requested the trial court to omit the instruction. He argues that by giving the

32

instruction, the trial court "shift[ed] the burden of proof by forcing a conclusion that the defendants were accomplices[,]" when in fact the evidence did not support such a conclusion. We disagree. First, as our Supreme Court noted, "*Alvarez* and *Box* make clear that a trial court should instruct the jury that, to the extent a codefendant's testimony tends to incriminate a defendant, it should be viewed with care and caution and is subject to the corroboration requirement." (*Avila, supra*, 38 Cal.4th at p. 562.) Thus, even though defendant's case is different in that he and his codefendant did not want the accomplice corroboration instruction, the factual posture of defendant's case is one in which our Supreme Court has *clearly* indicated the accomplice corroboration instruction should be given.

Second, the instruction did not force the conclusion that defendant and Thomas were accomplices. The instruction was not argumentative in the sense that it pulled upon specific facts of defendant's case illustrating to the jury why he and Thomas were accomplices. Indeed, the instruction invited the jury to decide whether defendants were accomplices and instructed it only on the relevant elements to making that determination.

Third, contrary to defendant's argument, the evidence was reasonably susceptible to a conclusion that defendant and Thomas were accomplices in the abuse of B. The evidence showed B. had extensive injuries varying in age and were inflicted at a time when both defendant and Thomas had care over him. Thomas admitted to fearing child protective services and wanting to keep injuries from health professionals so that she would not be investigated by child protective services. Indeed, the evidence established that she communicated her fear to defendant. From this evidence, it is reasonable to conclude that Thomas facilitated defendant's ongoing abuse of B. by failing to report it when she knew it occurred. Accordingly, the instruction pertaining to accomplice corroboration was not argumentative nor did it shift the burden of proof. Thus, there was no instructional error.

## IV

*The Trial Court Did Not Abuse Its Discretion By*

*Excluding Child Protective Services Records Pertaining To Thomas*

Defendant contends the trial court erred by excluding records from child protective services regarding the agency's concerns about Thomas's neglect of her children, as well as Thomas's drug use during her pregnancies. Defendant also contends Thomas's prior statement to an employee of the agency -- that defendant moved in with her in July, as opposed to her testimony that he moved in with her in May -- should have been admitted. We disagree.

As described *ante*, we review a trial court's rulings on the admissibility of evidence for abuse of discretion. (*People v. Benavides, supra*, 35 Cal.4th at p. 90.) While defendant argues all the child protective services records are admissible character evidence, it is clear from the court's ruling that it excluded the evidence not only because it was inadmissible character evidence but also because any probative value was outweighed by the evidence's prejudicial effect. Further, much of the evidence defendant points to on appeal was admissible through means outside the child protective services records.

For instance, defendant contends the court should have admitted child protective services documentation demonstrating the neglectful environment in which Thomas raised her oldest child before he went to live with her parents because the evidence tended to corroborate the report she had strangled her oldest child in 2004, and thus tended to prove she strangled K. and abused B. But the fact Thomas's neglect of her oldest child prompted her parents to take custody of that child was testified to by Thomas's mother and friend. As was the fact Thomas suffered from heroin and methamphetamine addiction for the majority of her adult life. Similarly, a doctor testified that Thomas ingested methadone and marijuana while pregnant with the twins and Thomas's friend testified that Thomas's second child tested positive for

34

methamphetamine at birth. Finally, that B. was rushed to the hospital due to breathing issues shortly after being sent home after birth and that the twins were later removed from Thomas's care for a period of time was also within several witnesses' personal knowledge and later admitted into evidence through their testimony.

Child protective services records providing the same evidence that was admitted in other forms was cumulative and constituted an undue consumption of time. Further, and to the court's point, the conduct described in the reports was different in nature than that alleged at trial. Defendant's defense was that Thomas strangled K. and inflicted B.'s injuries. But the child protective services reports (except for the one pertaining to the strangulation of Thomas's oldest child) did not contain evidence that Thomas abused her children, only that she neglected them.

Finally, the records contained unsworn allegations from anonymous sources, and contained the conclusions of child protective services employees that Thomas posed a substantial risk of danger and that the children were likely to experience immediate or serious harm. These allegations and conclusions were bound to confuse the jury when determining the type of risk Thomas posed to her children. It was likely the jury would rely on the unsworn allegations or child protective services conclusions simply because they were contained in an official record, instead of weighing the evidence for itself as it was required to do. For these reasons, the trial court did not abuse its discretion by excluding child protective services records pertaining to Thomas's neglect of her children and drug use during her pregnancies.

The only evidence defendant cites that was not admitted into evidence in another form was Thomas's prior statement that she and defendant moved in together in July. Defendant argues this should have been admitted into evidence because it contradicted Thomas's testimony that the pair had moved in together in May. The distinction is probative, he argues, because if the two had actually moved in together in July, then defendant was not present on a consistent basis in May when B. was rushed to the

35

hospital with breathing issues and ultimately received a tracheotomy.  The problem with defendant's argument as to this item of evidence is that he did not attempt to impeach Thomas's testimony with her prior statement.  Thus, we will not address whether the court should have permitted him to do so.  (*People v. Seijas* (2005) 36 Cal.4th 291, 302 [" 'failure to make a timely and specific objection' on the ground asserted on appeal makes that ground not cognizable"].)

V

*The Trial Court's Instruction Classifying*

*Child Abuse As A General Intent Crime Was Harmless*

The jury was instructed regarding the union of act and intent as follows:  "The crimes and other allegations charged require proof of the union or joint operation of act and wrongful intent.  [¶]  The following crimes and allegations require general intent: Assault on a child under age eight resulting in death, as charged in Count 2; child abuse, as charged in Counts 3 and 4; the allegation in Count 4 [Thomas] permitted [K.] to suffer pain or injury resulting in death in violation of Penal Code Section 12022.95; and the lesser offenses of assault likely to produce great bodily injury, simple assault, and simple child abuse.  [¶]  For you to find a person guilty of these crimes or to find the allegation true, that person must not only commit the prohibited act, or fail to do the required act, but must do so with wrongful intent.  [¶]  A person acts with wrongful intent when he or she intentionally does a prohibited act on purpose or fails to do a required act.  However, it is not required that he or she intend to break the law.  The act required is explained in the instruction for that crime or allegation."

Defendant argues this instruction misstates the law because the child abuse charged in counts 3 and 4 (of which he was only charged with count 3) is not a general intent crime when the theory of guilt is based on indirect child abuse, which was one of the theories permitted by the substantive instruction on that count.  The People concede that, when based on an indirect theory of abuse, child abuse as defendant was charged in

36

count 3 is not a general intent crime. The People, however, argue the error was harmless because the instruction on child abuse identified the correct mental state. We agree with the People.

Whether the *Watson* harmless error standard or the more stringent *Chapman* standard is applicable to the incorrect identification of an offense as a general intent crime is not settled. (See *People v. Ngo* (2014) 225 Cal.App.4th 126, 162-163 [noting the unsettled nature of the issue but deciding the error was harmless "[e]ven under" the more stringent *Chapman* standard]; *People v. ZarateCastillo* (2016) 244 Cal.App.4th 1161, 1168 [applying *Chapman* standard without discussion].) We need not decide which standard applies because we conclude the error harmless even under the more stringent *Chapman* standard.

Our Supreme Court has observed that classifying an offense as a general intent or specific intent crime is not always meaningful because " ' "[t]he critical issue is the accurate description of the state of mind required for the particular crime." ' " (*People v. Rathert* (2000) 24 Cal.4th 200, 205.) Classification is necessary " 'when the court must determine whether a defense of voluntary intoxication or mental disease, defect, or disorder is available; whether evidence thereon is admissible; or whether appropriate jury instructions are thereby required.' " (*Ibid.*)

Here, the instructions on child abuse accurately reflected that to convict defendant of indirect child abuse the jury must find "defendant was criminally negligent when he or she caused or permitted the child to be endangered." The instruction defined criminal negligence as "involv[ing] more than ordinary carelessness, inattention, or mistaken judgment. [¶] A person acts with criminal negligence when: [¶] One, he or she acts in a reckless way that is a gross departure from the way an ordinarily careful person would act in the same situation. [¶] Two, the person's acts amount to disregard for human life or indifference to the consequences of his or her act. [¶] And three, a reasonable person

37

would have known that acting in that way would naturally and probably result in harm to others."

Even though a preliminary instruction informed the jury child abuse was a general intent crime and all that was required was for defendant to hold a wrongful intent, the specific instructions defining the elements required to find him guilty of indirect child abuse specified more was required. Specifically, the jury must also find defendant was criminally negligent. Further, nothing the prosecutor said during closing arguments suggested to the jury that it should disregard the explicit direction of the specific instructions and there is no reason to believe the jury did so. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852 [jurors are presumed to have followed the court's instructions].) Thus, there is "simply no reason to believe that the jury would have disregarded the explicit direction of the later instructions because of, at best, a mere implication arising from the earlier instructions." (*People v. ZarateCastillo, supra*, 244 Cal.App.4th at p. 1169.) Accordingly, the error was harmless beyond a reasonable doubt.

VI

*Recently Enacted Legislation Requires We Remand Defendant's Case For Resentencing*

Defendant was sentenced to the principal term of 25 years to life for the assault of K. causing death. The term of 15 years to life for K.'s second degree murder was stayed pursuant to Penal Code section 654, which currently mandates sentencing courts stay the shorter sentence falling within its provisions. (*People v. Mejia* (2017) 9 Cal.App.5th 1036, 1047-1048.) Assembly Bill No. 518 (Stats. 2021, ch. 441, § 1) was recently enacted and took effect on January 1, 2022, before defendant's judgment becomes final. The bill amends Penal Code section 654 to provide the trial court with discretion to impose the sentence of either the assault causing death conviction or the second degree murder conviction, which could result in the trial court imposing the shorter rather than the longer sentence. We thus conclude it is appropriate to remand the matter for resentencing. (See *In re Estrada* (1965) 63 Cal.2d 740, 744-745 [absent evidence of

38

contrary legislative intent, ameliorative criminal statutes apply to all cases not final when the statute takes effect]; see also *People v. Woods* (2018) 19 Cal.App.5th 1080, 1090-1091.)

## DISPOSITION

The case is remanded for the trial court to exercise its newly granted discretion when sentencing defendant.  The judgment is affirmed in all other respects.

/s/
Robie, Acting P. J.

We concur:

/s/
Mauro, J.

/s/
Renner, J.